UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

DOUGLAS J. HOWERY,           )
                             )
        Petitioner,          )
                             )
    v.                       )        Case No. 4:19 CV 2564 CDP
                             )
EILEEN RAMEY,                )
                             )
        Respondent.          )

## MEMORANDUM & ORDER

This matter is before the Court on Missouri state prisoner Douglas J.

Howery's petition for a writ of habeas corpus under 28 U.S.C. § 2254.  Because his

claims are meritless or procedurally defaulted, I will deny his petition.

### Background

Howery is currently incarcerated at the South Central Correctional Center in

Licking, Missouri, pursuant to a judgment and sentence of the Circuit Court of

Audrain County, Missouri.  On November 29, 2012, a jury found Howery guilty of

first-degree murder, and on February 4, 2013, the circuit court sentenced him to

life imprisonment without possibility of probation or parole.  The Missouri Court

of Appeals summarized the underlying facts of the case as follows:

> Howery and his wife, Betty Howery ("Betty"), lived on a farm in
> Annada, Missouri, in Pike County. The farm property was originally
> purchased by Betty in 1984, but she later transferred ownership to
> herself and Howery jointly after they were married. The farm property

had a home on it that was serviced by a septic tank, as well as several outbuildings and sheds.

Betty and Howery had a rocky relationship that involved heated arguments. Betty told her sister that she was thinking about getting a divorce. Betty also told her son, Matthew Higginbotham ("Higginbotham"), that there were problems with the relationship and that she was trying to leave. Betty told Higginbotham that if anything ever happened to her, half of the farm would be his.

In early 1991, Howery began an affair with a woman named Donna. When Donna discovered that Howery was married, she confronted him about his marriage. Howery told Donna that his marriage to Betty was over and that they were getting a divorce. Donna became uncomfortable with their relationship and told Howery that he needed to decide whether or not his marriage to Betty was over. Howery convinced Donna that the marriage was over and they resumed dating in mid-1991.

In November 1991, Betty and Howery's home on the farm in Annada burned down. Betty and Howery received an insurance settlement of more than $214,000 as a result of the fire, and they moved to an apartment in St. Charles. After the fire, Betty and Howery argued about the money they received from the settlement, and Betty appeared upset, nervous, and unhappy to co-workers.

In February 1992, Betty and Howery used a portion of the settlement to purchase a piece of property with a man named Melvin Kinnard ("Kinnard"). Howery and Kinnard were going into business together, although the business was in Donna's name. Around this time, Betty suspected that Howery was having an affair and began calling Kinnard asking for Howery's whereabouts. On February 19, 1992, Kinnard told Howery that he needed to do something about the situation because he would not lie for Howery about his relationship with Donna. At that time, Howery knew Donna was pregnant with his child.

On February 20, 1992, Howery and Donna went to Betty's workplace. Howery instructed Donna to drive Betty's vehicle back to Donna's house. They did not leave another car for Betty, and Donna did not question why they picked up Betty's vehicle. Donna did not see Howery again until the next day.

While at work on February 20, Betty received a phone call that upset her, which had something to do with her account being cleaned out. Betty left work before her shift ended and went with Howery, who picked her up and drove to a title company where they signed

documents for the property they were purchasing for the joint business with Kinnard.

After signing the documents at the title company, Howery and Betty drove to the farm in Annada. Betty called her father from an outbuilding on the farm to tell him they would no longer need to borrow the money he was planning to lend them to buy a new home. Howery also spoke on the phone with Betty's father. Howery told Betty's father that he did not want to go into debt and would rather rent than purchase a new home. After Betty spoke with her father, no one but Howery saw or heard from Betty again.

The following day, February 21, Howery called Betty's work and left a message saying that Betty would be taking a vacation day. Howery then picked up Donna and his first words to her were "well now it's on." When Donna asked what he meant, Howery explained that he and Betty had a fight the night before and that he left Betty at the farm. Howery said he told Betty all about Donna and their plans to move in together. From that day on, Howery spent every night with Donna, and the couple moved in together two weeks later.

On February 23, Betty's sister held an 80th birthday party for their father. When Betty did not show up at the party, Betty's sister called Higginbotham. Unable to contact his mother and concerned for her safety, Higginbotham contacted St. Charles police and made a missing persons report.

St. Charles police contacted Howery about Betty's disappearance. Howery told police that on February 20, he had driven Betty to the farm after they signed the paperwork at the title company. While at the farm, Betty and Howery argued about the insurance settlement money. Howery said Betty allegedly showed him ten to twelve thousand dollars in cash in her purse that she had saved. Howery said that he told Betty it did not matter because they might not be together much longer and that they might be getting divorced. Howery told police that Betty wanted him to take her back to the city to get her vehicle, but that she finally told him just to leave her at the farm. Howery said that Betty told him she would have someone take care of her, so he left her at the farm around 7:45 p.m. with no car. Howery said he returned to the property on the following Saturday and the following Monday to see if Betty was still there, but she was not.

On February 26, police searched the farm with Howery's consent. Howery accompanied the officers during the search and showed them everything on the property. Howery did not alert the

police to the property's septic tank. The officers neither knew there was a septic tank on the property, nor did they notice any holes in the ground or an access point to a septic tank. Howery told the officers that he and Betty had gotten into an argument because Betty wanted to buy a new home but he did not want to due to their marital problems and his relationship with Donna. Howery said that Betty became angry when he admitted he was having an affair, but that their argument was only verbal. Howery told the officers that when he told Betty it was time to leave, Betty said she would call somebody that cared. Howery then left Betty at the farm with no means of transportation. Howery further told the officers that after he left the farm, he got all the way back to their apartment but decided to head back to the farm without ever exiting the vehicle. Howery then changed his mind again just before reaching the farm and turned back toward St. Charles. Rather than taking a direct route, Howery went out of his way and drove a longer, indirect route back to St. Charles. When asked why he drove the longer route, Howery first said that he did not know. About 10 minutes later, Howery volunteered that the route he drove would allow him to take some back roads to go back to the farm if he changed his mind again.

Between February 1992 and June 1998, police had no significant leads as to Betty's whereabouts. In 1998, law enforcement officers reviewed the previous reports that were written in 1992 and interviewed some people including Kinnard, who had not been interviewed in 1992. Kinnard told police that sometime after closing on the business property, Howery told Kinnard that Betty "wouldn't be bothering [him] anymore." The information from Kinnard led to another search of the farm property, this time with cadaver dogs. Police found no sign of Betty.

In 2000, Howery obtained a divorce from Betty, and all the property that he held jointly with Betty was placed in his name. About a month later, Howery and Donna were married.

In 2007, Kinnard sold the farm property to an LLC. In 2008, the new owner hired a work crew to clean up the property. The workers were trying to remove some concrete surrounding a hole in the ground when they discovered an underground septic tank that was approximately six feet wide and eight feet deep. As the workers attempted to remove the septic tank with a lift bucket, the septic tank broke into three pieces and its contents spilled out. A tooth on the lift bucket also broke off. One of the workers went to search for the tooth that had broken off and found a human bone inside the contents of the

septic tank. The workers called the police, and more bones were recovered from the contents of the septic tank. Those bones consisted of a human head, jaw, arms, hips, ribs, and vertebrae. DNA testing showed that the bones were the remains of Betty Howery.

Along with Betty's remains, police found a .38-caliber double-barreled derringer handgun, whose partially visible serial number matched part of the serial number of a .38-caliber derringer that belonged to Betty. The bottom barrel contained an expended cartridge while the top barrel contained what appeared to be a live round. Donna later testified that Howery carried a small gun when she met him. After Betty disappeared, Howery told Donna that he finally found a derringer to replace one that he had "got rid of a while back."

*State v. Howery*, 427 S.W.3d 236, 241-43 (Mo. Ct. App. 2014); (ECF 14-6 at pp. 2-6).

Howery appealed his conviction to the Missouri Court of Appeals, challenging the sufficiency of the evidence supporting his conviction and arguing that the trial court committed evidentiary errors. The Missouri Court of Appeals affirmed his conviction on April 1, 2014. *Id.* Howery filed a timely pro se motion for post-conviction relief under Missouri rule 29.15. Appointed counsel filed an amended motion, raising three claims of ineffective assistance of trial counsel. After an evidentiary hearing, the motion court denied the motion. Howery appealed the denial of only one of his claims. On December 26, 2018, the Missouri Court of Appeals affirmed the denial of his claim. *Howery v. State*, 564 S.W.3d 404 (Mo. Ct. App. 2018) (order) (per curiam).

Howery filed this habeas petition on September 12, 2019, claiming that he is in custody in violation of the Constitution.  He states the following grounds for relief:

1. There was insufficient evidence that he killed Betty;

2. There was insufficient evidence that he deliberated before killing Betty;

3. The trial court violated his rights to due process and a fair trial by overruling his hearsay objection to testimony from Meg Schaible, one of Betty's coworkers;

4. The trial court violated his rights to due process and a fair trial by overruling his objection to Kinnard's testimony that "after being in business with [Howery] for a few years, I realized how crooked he was";

5. The trial court violated his rights to due process and a fair trial by overruling his objection to Higgonbotham's testimony that Howery physically abused him and Betty;

6. His trial counsel was ineffective for failing to call an expert witness to testify on the dangers of septic tanks;

7. His trial counsel was ineffective for failing to impeach Kinnard by using prior inconsistent statements; and

8. His trial counsel was ineffective for failing to include the proper basis for his objection to Schaible's testimony in his motion for a new trial.

In response, Respondent argues that I should defer to the Missouri Court of Appeals' determinations that Grounds 1, 2, 4, 5, and 6 are without merit.  Respondent asserts that the remaining grounds are procedurally defaulted.

**Discussion**

**A. Claims Adjudicated in State Court**

Grounds 1, 2, 4, 5, and 6 were denied on the merits in state court.  When a claim is adjudicated on the merits in state court, I may not grant a writ of habeas corpus unless

> the adjudication of the claim—
>
> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  "This is a 'difficult to meet' and 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt.' "  *Cullen v. Pinholster*, 563 U.S. 170, 181 (2015) (citations omitted).

Under subsection (1), a state court's decision is "contrary to" clearly established Federal law when it "arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case different than [the Supreme Court] on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000).  A state court decision involves an "unreasonable application of" clearly established Federal law when it "identifies

the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.*

Under subsection (2), a "state court decision involves 'an unreasonable determination of the facts in light of the evidence presented in the state court proceedings' only if it is shown that the state court's presumptively correct factual findings do not enjoy support in the record." *Jones v. Luebbers*, 359 F.3d 1005, 1011 (8th Cir. 2004) (citation omitted).  The petitioner must make this showing by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

### a.  Insufficiency of the Evidence – Grounds 1 and 2

Howery raises two grounds for relief challenging the sufficiency of the evidence supporting his conviction.  In Ground 1, he argues that the State failed to show that he murdered Betty.  In Ground 2, he argues that the State failed to show that he deliberated before doing so.

For sufficient evidence to support a conviction, the Fourteenth Amendment Due Process clause requires "evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense." *Jackson v. Virginia*, 443 U.S. 307, 316 (1979).  When reviewing a claim challenging the sufficiency of evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

*Id.* at 319.  "Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution."  *Id.*  On habeas review, "[w]e also presume that the findings of fact made by a state court are correct unless the petitioner rebuts that presumption by clear and convincing evidence."  *Evans v. Luebbers*, 371 F.3d 438, 441 (8th Cir. 2004).

Under Missouri law at the time Howery's conviction became final, to prove a charge of first-degree murder, the State was required to prove that (1) the defendant caused the victim's death, (2) he or she did so knowingly, and (3) he or she did so after deliberation.  Mo. Rev. Stat. § 565.020 (2016).  Howery challenges the sufficiency of the evidence supporting the first and third elements.  He argues that the medical examiner who examined Betty's remains, Dr. Mary Case, could not say what exactly killed Betty, and that Betty could have accidentally fallen in the septic tank.  But even if her death was not an accident, he argues, there was no evidence that he killed her or that he deliberated before doing so.

The Missouri Court of Appeals rejected these arguments on direct appeal.[1]  First, it noted that there was evidence that Betty was killed and did not accidentally

---

[1] Howery's memorandum in support of his petition is nearly identical to his appellate and post-conviction briefs.  (*See* ECF 14-3, 14-5, and 14-7)

fall in the septic tank: Dr. Case testified that Betty sustained five fractures to the skull at or near the time of her death, that those fractures were inconsistent with injuries someone would sustain from falling down, that fracturing the skull takes significant force, and that the fractures in Betty's skull could have been caused by blunt-force trauma such as one or more blows to the head.  Though Dr. Case could not say precisely what killed Betty, she testified that she believed that Betty was killed in a violent way.  (ECF 14-1 at pp. 672-77; ECF 14-6 at pp. 8-9.)

Second, the court of appeals identified substantial circumstantial evidence supporting a finding that it was Howery that killed Betty:

> On the day Betty disappeared, Howery instructed Donna to take Betty's car from Betty's work without leaving her another vehicle. Later that day, Howery and Betty drove out to the farm where, by Howery's own admission, the two fought over money and his relationship with Donna. Howery then claimed to have left Betty at the farm with no means of transportation while he allegedly drove back and forth between the farm and the couple's apartment in St. Charles, taking back roads and stopping to watch the river. Outside of Howery's claim as to his route, his whereabouts were unaccounted for the rest of the evening. The next day, Howery called Betty's work to say she would be taking vacation, and he told Donna "well now it's on." Howery also assured Kinnard that Betty would no longer be bothering him.
> When police searched the property for Betty, Howery did not alert them to the presence of the septic tank on the property, despite his knowledge of its location. Betty's remains were subsequently found in the septic tank. The evidence at trial established that Betty was killed either by blunt force trauma or by a gunshot fired from a larger-caliber weapon, and a .38-caliber derringer containing an expended round was buried with Betty's body. Donna testified that she had seen Howery carrying a small gun around before the murder, and Howery later told Donna that he found a derringer to replace the one he "got rid of."

The State also established a motive for Howery to kill Betty. The couple had received more than $200,000 as an insurance settlement after their home was destroyed by fire, and they fought over what to do with the money. Betty wanted to buy a new home, while Howery wanted to start a new life with his pregnant girlfriend. The State demonstrated that Howery stood to gain more financially from Betty's death than by divorcing her and, in fact, ended up with all of the money and property that had been in their name jointly.

(ECF 14-6 at p. 10-11.)

Finally, the court of appeals reasoned that a rational trier of fact could have found that Howery deliberated before killing Betty.  Under Missouri law, "deliberation" was defined as "cool reflection for any length of time no matter how brief."  Mo. Rev. Stat.  § 565.002(3) (2016).  Proof of such reflection required "only that the killer had ample opportunity to terminate the attack once it began." *State v. Johnston*, 957 S.W.2d 734, 747 (Mo. 1997).  Here, the court of appeals found that the jury could have reasonably concluded both that Betty suffered multiple blows to the head and that Howery dumped her body into the septic tank and covered it with dirt to conceal evidence of the crime.  It reasoned that both findings evinced deliberation.  *See Id.* at 748 ("Deliberation may also be inferred when there are multiple wounds or repeated blows."); *State v. Tisius*, 92 S.W.3d 751, 764 (Mo. 2002) ("Disposing of evidence and flight can support the inference of deliberation.").

A State appellate court's conclusion that the evidence was sufficient to support a criminal conviction is entitled to great deference on habeas review.

*Jackson*, 443 U.S. at 323.  I may grant relief on Howery's claims only if the court of appeals' conclusions were both incorrect and unreasonable.  *See Cole v. Roper*, 623 F.3d 1183, 1187 (8th Cir. 2010).

The factual findings made by the court of appeals are presumed correct, and Howery has not demonstrated otherwise.  *See* 28 U.S.C. § 2254(e)(1).  Nor has Howery shown that the court of appeals' conclusion that there was sufficient evidence to support his conviction was contrary to, or involved an unreasonable application of, clearly established federal law.  The court of appeals correctly applied the *Jackson* standard to the facts and reasonably determined that there was sufficient evidence to support Howery's conviction.  Grounds 1 and 2 are therefore denied.

### b.  Due Process – Grounds 4 and 5

In Grounds 4 and 5, Howery challenges two evidentiary rulings.  In Ground 4, Howery argues that the trial court violated his rights to due process and a fair trial by admitting the following testimony from Kinnard, his former business partner: "Well, after being in business with [Howery] for a few years I realized how crooked he was."  (ECF 14-1 at pp. 412.)   In Ground 5, he argues that the trial court violated his rights to due process and a fair trial by admitting testimony

from Betty's son, Matthew Higgonbottam, that Howery physically abused him and
Betty between 1980 and 1982.[2]

"[I]t is not the province of a federal habeas court to reexamine state-court
determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 67
(1991).  This court may reverse a state court evidentiary ruling under the due
process clause only if the "petitioner . . . shows that the alleged improprieties were
so egregious that they fatally infected the proceedings and rendered his entire trial
fundamentally unfair." *Anderson v. Goeke*, 44 F.3d 675, 679 (8th Cir. 1995)
(quoting *Hamilton v. Nix*, 809 F.2d 463, 470 (8th Cir. 1987)).  To do so, "the
petitioner must show that there is a reasonable probability that the error
complained of affected the outcome of the trial—i.e., that absent the alleged
impropriety the verdict probably would have been different." *Id.*  Important

---

[2] When Higgonbotham testified that he was concerned when his mother failed to show up to
work and her father's birthday party, the following exchange occurred:

> [PROSECUTOR]: What were your concerns?
> [HIGGINBOTHAM]: My concerns were Doug had done something to her.
> [PROSECUTOR]: And why would you say that?
> [HIGGINBOTHAM]: Their relationship had always been somewhat rocky. I'll
> leave it at that.
> [PROSECUTOR]: Well, explain that to me, what somewhat rocky means to you.
> [HIGGINBOTHAM]: Explosive. They would go for periods of time and things
> would be okay and then if they got in a fight when I actually lived in the trailer
> there were very heated exchanges, physical exchanges.
> [PROSECUTOR]: And when you say physical I mean tell me what you personally
> saw.
> [HIGGINBOTHAM]: I've seen my mother get hit. I know for a fact my mother's
> tooth was chipped because she was thrown into a dining or living room table.
> Frankly I was hit.

(ECF 14-1 at pp. 237-238.)

considerations in this inquiry include "the frequency and pervasiveness of the alleged misconduct in the context of the entire trial, the weight of the evidence supporting guilt, and whether the trial judge gave a cautionary instruction to the jury on how to properly use the testimony elicited." *Id.*

When Howery raised his due process claims on direct appeal, the Missouri Court of Appeals agreed that the trial court abused its discretion by allowing Kinnard's and Higginbotham's statements.  But the court found that each statement was an "isolated incident of minimal consequence in the course of a long trial." (ECF 14-6 at pp. 19, 22 (quoting *State v. Clark*, 747 S.W.2d 197, 201 (Mo. Ct. App. 1988).)  It noted that Kinnard's reference to Howery being "crooked" was brief and unsolicited.  (*Id.* at 22.)  The events described by Higginbotham occurred 10 to 12 years before Betty's disappearance.  (*Id.*)  And the state offered no other evidence about them.  Considering the other evidence presented at trial, the court of appeals could not conclude that jury probably would have reached a different conclusion had either Kinnard's or Higgonbotham's statements not been admitted. (*Id.* at 19, 22.)

The Court of Appeals correctly evaluated whether there was a reasonable probability the trial court's errors affected the outcome of the trial.  (ECF 14-6 at pp. 19, 22.)  Its conclusion that admission of Kinnard's or Higgonbotham's statements did not affect the outcome of Howery's trial was not unreasonable.

- 14 -

Like the court of appeals, I "fail to see how Kinnard's one-word description of Howery was so prejudicial that it affected the outcome of the trial." (ECF 14-6 at p. 19.)  Higgonbotham's statements were more detailed, but the State offered no other evidence about Howery's physical abuse in the four-day trial.  This testimony was of minor importance considering the extensive circumstantial evidence of Howery's guilt, as noted above.

Howery argues that admission of Kinnard's and Higgonbotham's testimony "could have" influenced his decision to testify and the jury's view of his later testimony. (ECF 1-2 at pp. 35, 42.)  He also claims that the jury might have inferred from their testimony that "if he did it once, he'll do it again," or rushed to punish him for his past acts. (ECF 1-2 at p. 42.)  But the mere possibility of prejudice is insufficient.  Instead, Howery must show that the court of appeals incorrectly or unreasonably applied Supreme Court precedent in resolving his claims or made an unreasonable determination of the facts. *Anderson*, 44 F.3d at 679; *Middleton*, 498 F.3d at 820.  Because Howery has failed to make this showing, I will deny Grounds 4 and 5.

### c.  Ineffective Assistance of Counsel – Ground 6

In Ground 6, Howery argues that his trial counsel was ineffective for failing to call an expert witness to testify about the dangers of septic tanks.  On post-

conviction appeal, the Missouri Court of Appeals denied relief on this claim.  (*See* ECF 14-11.)

To show ineffective assistance of counsel, the defendant must satisfy the two-part test set out in *Strickland v. Washington*, 466 U.S. 668 (1984).  "First, the defendant must show that counsel's performance was deficient"—that is, counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  *Id.* at 687.  "Judicial scrutiny of counsel's performance must be highly deferential" and "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  *Id.* at 689.  Second, the defendant must show that his counsel's errors "prejudiced the defense."  *Id.* at 687.  This means that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.* at 694.

Howery argues that his counsel erred by failing to call a septic tank expert[3] because counsel knew or should have known that Dr. Case's opinion that Betty was murdered was based, in part, on the location of Betty's body.  Specifically, Dr.

---

[3] In his post-conviction motion and appeal, Howery argued that his trial counsel should have called an expert like James VonMeier, an environmental education specialist from Minnesota, to testify to the dangers of septic tanks.  (ECF 14-7.)  The motion court and court of appeals rejected this claim.  Now, Howery argues that his trial counsel should have called an expert other than VonMeier.  (*See* ECF 1-2 at p. 43.)

Case testified, "All I need is a body in a septic tank and that, to me that's a homicidal death."  (ECF 14-1 at p. 680.)  Howery claims that a septic tank expert could undermine Dr. Case's testimony by showing that it is possible to accidentally fall into a septic tank.  Construing his petition liberally, he claims that there is a reasonable probability that such testimony would create reasonable doubt that he killed Betty.

At Howery's Rule 29.15 hearing, Howery's trial counsel testified that he considered presenting evidence showing that Betty could have accidentally fallen in the septic tank and discussed the option at length with Howery.  He ultimately decided against it, however, because "any testimony or evidence that there might be an accidental falling would have been completely disbelieved by the jury." (ECF 14-8 at p. 9.)  Betty owned the property and would have been familiar with any septic-tank hole.  More importantly, the police did not find the septic tank when they conducted a search of the property a few days after she was missing, and photographs showed that the area where the septic tank was removed was covered by grass.  (*Id.*)  Counsel reasoned that arguing that Betty's death was an accident would only invite the jury to question, "[I]f the hole wasn't visible, who covered up the hole?" (*Id.* at p. 51)

On these facts, the motion court concluded that trial counsel's decision not to call a witness to testify on the dangers of septic tanks was a reasonable choice of

trial strategy.  And "actions by counsel that constitute sound trial strategy are not

grounds for ineffective assistance claims."  *State v. Hall*, 982 S.W.2d 675, 680

(Mo. 1998).  The Missouri Court of Appeals agreed.  (ECF 14-11 at pp. 5-7.)

On habeas review, it is not sufficient for Howery to "show that he would

have satisfied *Strickland*'s test if his claim were being analyzed in the first

instance[.]"  *Bell v. Cone*, 535 U.S. 685, 698-99 (2002).  "So long as the state

court's decision was not 'contrary to' clearly established law," Howery must show

that "the state court's determination under the *Strickland* standard is

unreasonable[.]"  *Williams v. Roper,* 695 F.3d 825, 831 (8th Cir. 2012).  "This

standard was meant to be difficult to meet, and 'even a strong case for relief does

not mean the state court's contrary conclusion was unreasonable.' "  *Id*. (quoting

*Harrington v. Richter*, 562 U.S. 86, 102 (2011)).

Howery has not met this standard.  He has not shown—nor even argued—

that the Missouri Court of Appeals' conclusion was unreasonable or contrary to

clearly established Federal law.  Nor has he shown that the decision was based on

an unreasonable determination of the facts.  The Missouri Court of Appeals

correctly applied the *Strickland* standard and reasonably determined that counsel

was not ineffective.  Ground 6 is therefore denied.

## B. Procedurally Defaulted Claims

Howery failed to preserve Grounds 3, 7, and 8 for habeas review.  To obtain federal habeas review of a claim raised in a § 2254 petition, the petitioner must have first raised the federal constitutional dimensions of the claim in State court in accordance with State procedural rules.  *Duncan v. Henry*, 513 U.S. 364 (1995) (per curiam); *Beaulieu v. Minnesota*, 583 F.3d 570, 573 (8th Cir. 2009).  If the petitioner failed to properly present the claim in state court, and no adequate non-futile remedy is currently available by which he may bring the claim in that forum, the claim is deemed procedurally defaulted and cannot be reviewed by the federal habeas court "unless the [petitioner] can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice."  *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

### a.  Due Process – Ground 3

In Ground 3, Howery argues that the trial court erred by overruling his hearsay objection and allowing the State to introduce evidence from Meg Schaible, one of Betty's coworkers.  At trial, Schaible testified that Betty was upset about their house burning down and losing all her possessions.  When the prosecutor asked whether Betty had indicated anything unusual about the possessions lost in the fire, Schaible testified, "Well I asked about her husband's business where he

sold guns." (ECF 14-1 at p. 732.)  Howery objected that Schaible's statement was inadmissible hearsay.  The court overruled his objection, and Schaible continued: "And I said did he lose all his guns in the fire and she said no, he had moved them to an out building away from the fire so he didn't lose any of his possessions." (*Id.*)

In his motion for a new trial, Howery claimed that the trial court erred by allowing the testimony, not because it was hearsay, but because it was irrelevant and because the State's questions called for speculation.  On appeal, Howery again argued that the trial court erred by overruling his hearsay objection.  (ECF 14-3 at p. 22.)  The court of appeals found that Howery's claim was not preserved for appellate review because, in his motion for a new trial, Howery incorrectly directed the trial court to a ruling it did not make.  (*See* ECF 14-6 at p. 15 (citing *State v. Dunagan*, 772 S.W.2d 844, 849-50 (Mo. Ct. App. 1989)).)  It then reviewed Howery's claim for plain error consideration.  (ECF 14-6 at pp. 15-16.)

As a federal habeas court, I "cannot reach an otherwise unpreserved and procedurally defaulted claim merely because a reviewing state court analyzed that claim for plain error."  *Clark v. Bertsch*, 780 F.3d 873, 874 (8th Cir. 2015) (citing *Hayes v. Lockhart*, 766 F.2d 1247, 1253 (8th Cir. 1985)).  I may only review the merits of Howery's claim if he shows cause and prejudice, or that failure to consider the claims will result in a fundamental miscarriage of justice.  Howery alleges neither cause and prejudice to overcome the procedural default nor that

failure to consider his claims will result in a fundamental miscarriage of justice.[4]
Thus, Howery's claim is procedurally defaulted, and I am unable to review it.  I
will therefore deny Ground 3.

### b.  Ineffective Assistance of Counsel – Grounds 7 and 8

In Grounds 7 and 8, Howery raises two ineffective assistance of counsel
claims.  In Ground 7, he argues that trial counsel was ineffective for failing to
impeach Kinnard with prior inconsistent statements.  And in Ground 8, he argues
that trial counsel was ineffective for failing to preserve his hearsay objection to
Schaible's testimony in his motion for a new trial.

Howery raised both claims in his amended motion for post-conviction relief
but failed to raise them in his appeal from the denial of his motion.  (ECF 14-7 at
pp. 4-6; ECF 14-9.)  "Missouri procedure requires that a claim be presented 'at
each step of the judicial process' in order to avoid default."  *Jolly v. Gammon*, 28
F.3d 51, 53 (8th Cir. 1994) (quoting *Benson v. State*, 611 S.W.2d 538, 541 (Mo.
Ct. App. 1980).  "Failure to raise a claim on appeal from denial of a post-
conviction motion erects a procedural bar to federal habeas review."  *Id.*  So,

---

[4] Although Howery does not identify any cause for his default in Ground 3, in Ground 8 he
argues that his trial counsel was ineffective for failing to properly present his hearsay objection
in his motion for a new trial.  Ineffective assistance of counsel may be cause for a procedural
default.  *Murray v. Carrier*, 477 U.S. 478, 488 (1986).  But "an ineffective-assistance-of-counsel
claim asserted as cause for the procedural default of another claim can itself be procedurally
defaulted[.]"  *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000).  And, as discussed below,
Ground 8 is also procedurally defaulted because Howery failed to preserve it for review.  It
therefore cannot suffice as cause for his default of Ground 3.

Howery's claims are procedurally defaulted unless he can show cause and prejudice for his default.

Howery argues that he has cause for his default because his post-conviction "appellate counsel failed to raise [these] claim[s] in Appellant's Brief, despite the fact that [they were] clear and obvious claim[s] that should have been raised." (ECF 1 at pp. 18, 20.)  This is insufficient cause.  In *Martinez v. Ryan*, the Supreme Court recognized that habeas petitioners may establish cause for the default of ineffective assistance of trial counsel claims by showing ineffective assistance of counsel in initial-review collateral proceedings.  566 U.S. 1, 14 (2012).  But that exception does not apply to "attorney errors in other kinds of proceedings, including appeals from initial-review collateral proceedings."  *Id.* at 16.  *See also Arnold v. Dormire*, 675 F.3d 1082, 1087 (8th Cir. 2012).

Howery offers no other reason for his failure to present these claims in State court.  I will deny Grounds 7 and 8.

## Certificate of Appealability

Howery has failed to make a substantial showing that he was denied a Federal constitutional right.  *Cox v. Norris*, 133 F.3d 565, 569 (8th Cir. 1997) (for substantial showing, issues must be debatable among reasonable jurists, reasonably subject to a different outcome on appeal, or otherwise deserving of further

proceedings). I will therefore not issue a Certificate of Appealability on any of his claims.

Accordingly,

**IT IS HEREBY ORDERED** that Douglas Howery's petition for writ of habeas corpus under 28 U.S.C. § 2254 [1] is denied.

**IT IS FURTHER ORDERED** that a Certificate of Appealability will not issue in this action because petitioner Greer has not made a substantial showing of a denial of a constitutional right.

An appropriate Judgment is entered herewith.


CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 13th day of September, 2022.